IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA        )
                                )
            v.                  )  Criminal No. 03-19 Erie
                                )
ISAIAH LUTHER MERCER            )
   a/k/a "Lovey"                )
```

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S PRETRIAL MOTIONS

AND NOW comes the United States of America, by its attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Christian A. Trabold, Assistant United States Attorney for said District and states as follows:

### I.  Background

Mercer was indicted by a federal grand jury on April 8, 2003.  The indictment charges Mercer with one count of possession with the intent to distribute fifty (50) grams or more of cocaine base in violation of 21 U.S.C. §841(a)(1) and 841(b)(1)(A)(iii). Mercer was not apprehended until September 7, 2005, when he was captured by Deputy United States Marshals in Detroit.   When arrested, Mercer falsely indicated his name was Ron Davis.

The facts leading to the indictment in this case are as follows: On February 18, 2003, Detective Mike Nolan of the City of Erie Bureau of Police received information from a confidential informant that "King", who was known to be Isaiah Mercer, was

returning to Erie from Detroit that evening and was transporting a large amount of crack cocaine. Detective Nolan had received information from three other sources in February 2003 that Mercer was in possession of large amounts of crack cocaine and approximately $20,000 to $25,000 in cash.

Based upon this information Detective Nolan initiated surveillance, at approximately 9:55 PM, at 942 East 23rd Street in the City of Erie, which was the residence of Sharice Fletcher, Mercer's girlfriend. Approximately ten minutes later, Mercer arrived, driving a champagne colored Chevy Impala. Detective Nolan, who had checked Mercer's driving status earlier in the evening and found he did not have a valid license, decided to cite Mercer for driving without a valid license. Detective Nolan then approached Mercer, identified himself, and asked Mercer why he was driving without a valid license. Mercer, who appeared very nervous, said he was sorry. Detective Nolan then patted Mercer down, told him he would be getting a citation and then asked him to have a seat in his car until the citation was completed.

Mercer then asked if he could walk to the side of Fletcher's residence so he could urinate. Mercer was allowed to do so. Detective Nolan then asked Mercer if he had any drugs or weapons in his vehicle. Mercer said "you can go ahead and check." Mercer's vehicle and a bag which Mercer had just unloaded from the car were searched. Two large wicker gift baskets containing

2

scented candles were located on the back seat, but no drugs were found on Mercer, in the bag or inside the car. Mercer was then asked who owned the car and he indicated it was a rental from Enterprise. Mercer was then asked who rented the car and he said his friend, Ron Richmond. Detective Nolan then asked for the rental paperwork and Sharise Fletcher, who by this time had come out of her residence, went and retrieved the rental papers from inside the apartment. The rental agreement indicated that Mark Moore from Detroit rented the car and Ron Richmond was listed as the secondary driver. Detective Nolan then located and interviewed Ron Richmond at his residence in the City of Erie. Richmond indicated that he had rented the vehicle for his friend, Isaiah Mercer. Richmond also indicated that Mark Moore was an alias used by Mercer.

On February 23, 2003, a confidential informant notified Detective Nolan that Mercer would be delivering crack cocaine later that evening. The informant told Detective Nolan that Mercer was scared that the police were watching him but was also bragging that he was stopped by the police in front of Sharise Fletcher's house and the police had his drugs in their hands but did not know it. The informant also indicated that Mercer was planning to move his drugs out of town soon and was attempting to sell as much crack as he could before leaving.

At approximately 10:00 PM on February 23, 2003, Detective Nolan met with the confidential informant in preparation for making a controlled purchase of crack from Mercer. The informant and his/her vehicle were searched with negative results. A quantity of recorded government funds were given to the informant to be used to buy crack from Mercer. The informant then met with Mercer while under surveillance. Upon the informant's arrival, Sharise Fletcher exited the vehicle which was being driven by Mercer. An exchange took place between the informant and Fletcher and then all parties left the area. It was then determined that Fletcher had provided the informant a quantity of suspected crack. The informant also revealed that Fletcher had more crack on her person.

Detective Nolan and other law enforcement officers then followed Mercer and Fletcher to the Holiday Inn Express at 8101 Peach Street. After Mercer parked his vehicle in the hotel parking lot, Detective Nolan and other officers approached him and made their presence known. As the officers approached Mercer's vehicle, Mercer noticed them and began to make hurried movements which caused the officers to conclude that he was either giving something to or taking something from Fletcher. Mindful of Mercer's history as a drug dealer, and the knowledge that Fletcher had crack on her person, coupled with Mercer's furtive movements and obvious nervousness, the officers drew their weapons and ordered Mercer and Fletcher to put their hands up. Mercer and Fletcher were then

4

removed from the car and patted down.  Detective Nolan immediately felt a golf ball sized, hard object in Fletcher's left inside coat pocket, which he immediately concluded was about an ounce of crack cocaine.  Detective Nolan did not remove the object from Fletcher's coat.  Rather, he told the other officers that he believed that Fletcher had crack on her and he was going to have to get a search warrant for the coat and the car.  Fletcher then began telling Detective Nolan that she could help him get other drug dealers if he would help her and Mercer in this situation.  Fletcher said she could "set up" a girl who was doing one to two ounces of crack a week.  As Detective Nolan was asking another officer for handcuffs to secure Fletcher, she continued to tell Detective Nolan about her willingness to do anything to help Mercer and herself.  Detective Nolan told Fletcher he would talk to her after he obtained a search warrant for her coat and retrieved the crack from her pocket.  Fletcher then said she would give the crack to Detective Nolan, reached into her pocket and handed the drugs to him.  Detective Nolan then told Fletcher that he would still have to go back to the Erie Police Department to get a search warrant for the car.

While Detective Nolan was dealing with Fletcher, Erie Police Detective Matt Fischer was patting Mercer down for weapons.  Detective Fischer felt a large lumpy object in Mercer's right jacket pocket.  Mercer was then asked if he had any drugs on him and he said no and then told Detective Fischer to go ahead and

check.  Detective Fischer then retrieved the object from Mercer's coat and it was a quantity of suspected cocaine.  Mercer was then placed under arrest and read his Miranda rights.  He indicated that he understood his rights and immediately denied any knowledge of the cocaine.

It was then determined that Mercer and Fletcher were staying at the hotel.  Mercer consented to a search of their room which uncovered no drugs.  Fletcher was transported to the Erie police station prior to the initiation of the hotel room search.

After the hotel room was searched, Mercer was also transported to the Erie police station.  During the drive, Mercer was again provided his Miranda rights.  Mercer repeated numerous times that he wanted to do something to help Fletcher but he did not know anyone in Pennsylvania.  Mercer then said he might be able to do something with drug dealers in Michigan.  Mercer further indicated that Fletcher had a bad heroin addiction and was also addicted to crack.  Detective Nolan then asked Mercer if there were additional drugs in the vehicle or in Mercer's residence.  Mercer indicated that there were no additional drugs and consented to a search of both the vehicle and his residence at 943 East 23rd Street.  Mercer asked if he could be present when the officers searched the residence.

Upon arrival at the Erie Police Department, Mercer was booked in and placed in a holding cell.  Mercer indicated that he

wanted to talk further with the officers. Detective Nolan told Mercer that he would have to wait to finish their conversation.

Detective Nolan and Detective Don Dacus then went to speak with Fletcher who was also in a holding cell. After Fletcher indicated that she still wanted to talk with the officers she was taken from her cell to an interview room. Fletcher's <u>Miranda</u> rights were then explained to her and she signed a rights waiver form and agreed to speak to the detectives. Fletcher indicated that she and Mercer had been staying at the Holiday Inn because Mercer was afraid that the police were on to him. Detective Nolan asked her where the rest of the cocaine was located and Fletcher indicated 2511 German Street, the residence of her friend Deborah Foreman. Fletcher was then asked how many ounces of cocaine were left and she indicated approximately fifteen ounces were in a safe at the residence. When asked about her cocaine habit, Fletcher indicated that she was an addict who smokes about an eight-ball a day.

Fletcher then suddenly changed her story and indicated that the drugs were at her residence at 943 East 23rd Street. She asked Detective Nolan several times to scratch any reference to 2511 German from his notes. Fletcher then said that there were two safes in her residence and the key was on the same keychain as Mercer's vehicle key, which the officers now possessed. Fletcher then gave Detective Nolan permission to go to her residence and

take possession of the safe containing the crack. She also consented to a search of the vehicle and signed consent forms for the residence and the vehicle.

Detective Fischer and several other officers then took Fletcher to her residence at 943 East 23rd Street. Upon arrival, Fletcher claimed that the apartment looked as if it had been broken into and ransacked. Detective Fischer then informed Detective Nolan that he felt Fletcher was lying in an attempt to conceal the actual location of the cocaine. Based upon this information, Detectives Nolan and Dacus decided to continue their conversation with Mercer.

Mercer was then taken from his cell to an interview room. Detective Nolan told Mercer that Fletcher had been honest with them about the rest of the drugs and that she was with some other officers who were retrieving the fifteen ounces of cocaine in the safe. Detective Nolan then asked Mercer who lived at 2511 German Street. Mercer then indicated that Deborah, a friend of Fletcher's, lived there and that he had put the safe with the cocaine in Deborah's apartment, but she knew nothing about the safe's contents. Mercer said he gave Deborah strict instructions not to tell anyone about the safe and not to let Fletcher or her mother have access to it. Mercer revealed there were about fourteen ounces of cocaine in the safe. Detective Nolan then asked if there was money in the safe. Mercer indicated that

8

someone had already come to town and picked up his money.  Mercer then authorized Detective Nolan's seizure and search of the safe, which was located at 2511 German Street.

Based upon Mercer's consent, officer's retrieved the safe from 2511 German Street.  When opened, the safe was found to contain multiple ounces of crack and powder cocaine, heroin, drug packaging supplies and United States currency.

## II.  Argument

### A.  Suppression of the Drug Evidence

It is well settled that law enforcement officers may conduct a search without probable cause or a search warrant based upon an individual's voluntary consent, and any evidence discovered during such a search may be seized and admitted at trial. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005); United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003).  While consent must be voluntary, it may be express or implied and need not be knowing or intelligent.  Schneckloth, 412 U.S. at 235; Lockett, 406 F.3d at 211.  Further, consent "may be given unintentionally and without knowledge of the right to refuse consent, and the police are not required to warn an individual of the right to refuse consent." Lockett, 406 F.3d at 211, citing Schneckloth, 412 U.S. at 235.

The voluntariness of a person's consent is a question to be determined from the totality of the circumstances.  Givan, 320

9

F.3d at 459, <u>citing</u> <u>Schneckloth</u>, 412 U.S. at 227.  The critical factors that make up a totality of the circumstances analysis are "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence and educational background of the consenting individual." <u>Givan</u>, 320 F.3d at 459, <u>citing</u> <u>United States ex rel. Harris v. Hendricks</u>, 423 F.2d 1096, 1099 (3d Cir. 1970).

Here, Mercer consented to the seizure of the drugs found on his person and the officers' seizure and search of the safe containing the drugs.  He then continued to cooperate by providing a videotaped statement implicating himself and explaining how he went about transporting and distributing drugs in this community. Mercer is a 51 year old man with multiple prior involvements in the criminal justice system.  He was a fugitive for over two years using multiple aliases to avoid capture.  He was well aware of his rights at the time he consented and had been informed of his <u>Miranda</u> rights several times after his arrest and prior to providing consent to search the residence at 2511 German Street. Therefore, his consent to seize and search the safe and his consent to the seizure of the crack on his person were voluntary and valid and his motion to suppress should be denied.

**B.   Discovery Issues**

Mercer has made a number of requests for pre-trial discovery. Essentially, these requests concern evidence favorable to the defendant and evidence concerning government witnesses.

Most of Mercer's requests are in relation to the identity of, statements from, and credibility of government witnesses. Initially, the government notes that Mercer is not entitled to witness statements or summary reports prior to the witness' testimony. The first subsection of the Jencks Act, 18 U.S.C. § 3500(a), states very clearly:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

This portion of the Jencks Act was enacted, in large part, because of the Department of Justice's serious concerns regarding actual and potential threats against and pressure upon witnesses in criminal cases and the consequent effect on the willingness of the witnesses to testify.

In United States v. Murphy, 569 F.2d 771, 774 (3d Cir. 1978), cert. denied, 435 U.S. 955 (1978), the Third Circuit affirmed a district court's denial of a defense motion for production of Jencks Act material at a suppression hearing. In so holding, the Murphy court reasoned:

11

> the Jencks Act flatly states that disclosure of
> prior statements by government witnesses may not be
> compelled "until said witness has testified on
> direct examination in the trial of the case." The
> blunt command of the statute together with the
> unequivocal legislative history has led to unbroken
> precedent in the Courts of Appeals denying to
> district courts the power to compel production of
> the statements of government witnesses until
> conclusion of direct examination at the trial.

Murphy, 569 F.2d at 773; See also, United States v. Wilson, 102

F.3d 968 (8th Cir. 1996)(though in many cases the government freely

discloses Jencks material in advance of trial, the government may

not be required to do so); United States v. Williams, 10 F.3d 1070,

1079 (4th Cir. 1993)(government not required to turn over witness

statements during suppression hearing as Jencks Act does not

provide basis for requesting materials to avoid surprise); United

States v. Bibbero, 749 F.2d 581 (9th Cir. 1984)(discovery of a

witness statement may not be compelled until the witness has

testified).   Hence, although the government may voluntarily

disclose Jencks Act material to the defense prior to trial, and

routinely does so the Friday before Monday jury selection, it can

nevertheless not be lawfully compelled to do so.

However, to the extent that the government has an

obligation under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v.

United States, 405 U.S. 150 (1972), and United States v. Agurs, 427

U.S. 97 (1976), to produce any of the information requested, the

government will do so if exculpatory evidence is discovered.

Notwithstanding, to the extent that the requests contained within Mercer's discovery motion seek to impose a greater burden and obligation on the government for disclosure of evidence beyond that established by Brady, Giglio, and Agurs, these requests should be denied.

The United States Court of Appeals for the Third Circuit has stated that the Brady doctrine is not a rule of pre-trial discovery, as it is attempted to be used here, but rather a rule of minimum fairness. United States v. Kaplan, 554 F.2d 577, 579 (3d Cir. 1977). See also, United States v. Campagnuolo, 592 F.2d 852, 859 (5th Cir. 1979) (Fifth Circuit determined that Brady is more properly considered as a rule of minimum fairness and prosecutorial obligation, rather than a rule of pre-trial discovery). Thus, the Brady rule is not a vehicle which permits Mercer to achieve wholesale discovery of the government's case. United States v. Frazier, 394 F.2d 258, 262 (4th Cir. 1968); Hemphill v. United States, 392 F.2d 45, 48 (8th Cir. 1968).

The standard under Giglio and its progeny with respect to impeachment material is whether the evidence will so affect the reliability of a witness in the government's case that the determination of guilt or innocence would be materially affected by the non-disclosure. Giglio, 405 U.S. at 154. In other words, the impeaching evidence must be able to have a definite impact on the credibility of an important government witness. United States v.

13

Crockett, 534 F.2d 598, 601 (5th Cir. 1976).  Giglio does not specify a time limit in which such materials must be turned over to the defense.  However, the government discusses several cases below which contradict Mercer's request for early disclosure and state, in accordance with the Jencks Act, that such material need not be turned over until the time of the witness' testimony.

Specifically addressing information relevant solely to the issue of impeachment, the district court, in United States v. Mitchell, 372 F.Supp. 1239 (S.D.N.Y. 1973), indicated that the government need not conduct a complete investigation of all government files, but must, at the time of the witness' testimony, indicate any agreements or bargains with respect to immunity or any other form of consideration which may impact upon the witness' testimony at trial.  Mitchell, 372 F.Supp. at 1257.  Accord, United States v. Joseph, 996 F.2d 36 (3d Cir.), cert. denied 114 S.Ct 357 (1993).  The United States Court of Appeals for the Third Circuit has stated that defendants' "right to a fair trial will be protected if disclosure [of such evidence] is made the day the witness testifies."  United States v. Higgs, 713 F.2d 39, 44-45, (3d Cir.), cert. denied, 104 S.Ct. 725 (1983) (addressing situation involving danger to witness).  See also, United States v. Cannone, 528 F.2d 296, 300-02 (2d Cir. 1975).

The government notes that the disclosure of such evidence at this time could force the government to produce a list of its

14

witnesses, which is not discoverable prior to trial. <u>United States v. Mitchell</u>, 540 F.2d 1163 (3d Cir. 1976), <u>cert</u>. <u>denied</u>, 429 U.S. 1099 (1977); <u>United States v. Addonizio</u>, 451 F.2d 49, 62 (3d Cir.), <u>cert</u>. <u>denied</u>, 405 U.S. 936 (1972). Therefore, while the government does not object to disclosing information concerning promises or considerations given to a witness, it does object to pretrial disclosure of these matters. Disclosure at this juncture is simply not mandated by this circuit and is contrary to the plain dictates of the Jencks Act. <u>See</u> <u>Higgs</u>, 713 F.2d at 44 (disclosure of names and addresses of government witnesses who had been offered immunity or leniency for their cooperation, as well as the substance of any promises made to witnesses by the government, could be made the day that witnesses were to testify and still satisfy <u>Brady</u>).

In sum, the government will make the requested materials available to the defense in due course, including witness' statements, pursuant to the Jencks Act on the Friday before Monday jury selection.

Mercer also seeks exculpatory evidence. The government is cognizant of its duty under <u>Brady</u> to disclose any evidence favorable to the defendant. In the exercise of due diligence, the government is not aware of any exculpatory material indicating that Mercer was not involved in the distribution of crack. If such evidence were to become available, it will be expeditiously forwarded to Mercer's counsel.

15

## C.  Retention of Officers' Rough Notes

Mercer requests an order directing government agents and state and local law enforcement officers to retain their rough notes concerning their investigation of this case.  Since Mercer was a fugitive for over two years it is possible that the law enforcement officers involved in this case have not retained their rough notes.  Nevertheless, the government has instructed the officers to preserve their notes about the investigation, if they still exist, during the pendency of Mercer's case.  Therefore, Mercer's motion should be denied as moot.

## D.  Disclosure and Exclusion of Uncharged Misconduct

Mercer seeks to have the Court require the government to give advance notice of its intention to use any evidence of other crimes, wrongs or acts.  Rule 404(b) of the Federal Rules of Evidence provides that the government must provide "reasonable notice in advance of trial" of its intention to offer evidence of other crimes, wrongs or acts.  Reasonable notice has been defined as: (1) one week prior to trial, United States v. Patel, 2002 WL 1750948 (N.D. IL); (2) at least ten days in advance of trial, United States v. Williams, 792 F.Supp. 1120 (S.D. IN 1992); and (3) two weeks prior to trial, United States v. Garrett, 2002 WL 1968391 (N.D. IL); United States v. Thomas, 1996 WL 210076 (N.D. IL).

In the instant case, no trial date has been set. Nevertheless, the government has no objection to providing its Rule

16

404(b) notice, should the government intend to introduce such evidence, sufficiently in advance of trial. Plainly, under the controlling case law, the government is under no obligation to provide its notice now, since no trial date has been set and it has not made a determination with respect to the use of such evidence.

### E.  Early Disclosure of Jencks Material

Mercer's request for early disclosure of Jencks material is duplicative of his requests for discovery and his request for disclosure of plea bargains, preferential treatment and promises to government witnesses.  The government has responded at length to this issue previously in this brief and will not rehash that response here.  Suffice it to say, that as is the custom in this district, the government will turn over all Jencks material the Friday before Monday jury selection.

### F.  Notice by the Government of Intention To Use Evidence Arguably Subject to Suppression

Mercer requests an order requiring the government to provide notice of its intention to use evidence subject to suppression.  Pursuant to Rule 12(b)(4)(B), at or soon after the arraignment, the defendant may request notice from the government of its intent to use evidence that the defendant may be entitled to discover in order to have an opportunity to file a motion to suppress. Fed.R.Crim.P. 12(b)(4)(B).

The government is not aware of any additional information or evidence beyond that addressed in the motion to suppress and the

17

previously provided discovery which may be subject to suppression. If the government determines that it will use any other evidence which is arguably subject to suppression, then the government will so notify the defendant. Therefore, Mercer's motion should be denied. See United States v. MacFarlane, 759 F.Supp. 1163 (W.D. Pa. 1991).

### G.    Preservation of Evidence

The government has no reason to conclude that evidence has not been preserved in this case. Certainly, it is in the government's interest to preserve all of the evidence should it be needed at a trial in this case. Thus, the government will instruct the law enforcement officers involved in this case to make certain that the evidence is preserved and that no evidence be discarded or destroyed.

### H.    Exclusion of Evidence of Mercer's Prior Convictions

Mercer's blanket assertion that all of his prior convictions should be excluded from evidence at trial is insufficient to justify such exclusion. Mercer fails to identify his prior convictions, much less establish or even attempt to demonstrate why their admission would be unduly prejudicial.

Further, as mentioned above, the government will provide notice of its intention to introduce Rule 404(b) evidence, including Mercer's prior convictions, ten days prior to the start of trial in this case. Greater advanced notice is not required by

18

the controlling case law and the government has not yet determined which of Mercer's prior convictions will be addressed in any possible 404(b) notice.

## III. <u>CONCLUSION</u>

WHEREFORE, the government respectfully requests that all of Mercer's pre-trial motions be denied.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney


s/Christian A. Trabold
CHRISTIAN A. TRABOLD
Assistant U.S. Attorney
PA ID No. 75013